# EXHIBIT E

# WYZ GIRL ENTERTAINMENT CONSULTING, LLC
# FAX COVER SHEET

**4717 15TH STREET, N.W., WASHINGTON, D.C. 20011**
**2120 L STREET, N.W. SUITE 210, WASHINGTON, D.C. 20039**
**202-822-3766    202-882-4745**
**FAX 703-995-4345    202-882-9895**

| Send to: _Greg/Jeff_ | From: _Lito Kesarui Esq_ |
|---|---|
| Attention: | Date: _9/26/05_ |
| Office location: | Office location: |
| Fax number: _212-665-5197_ | Phone number: |

☐ Urgent   ☐ Reply ASAP   ☐ Please comment   ☐ Please review   ☐ For your information

Total pages, including cover: _15_

Comments:

TRANSACTION REPORT

FOR:

SEP-26-02 02:21 PM

SEND

| DATE | START | RECEIVER | PAGES | TIME | NOTE |
|------|-------|----------|-------|------|------|
| SEP-26 | 02:11 PM | 12126655197 | 14 | 9'51" | OK |

P0149

# WYZ GIRL ENTERTAINMENT CONSULTING, LLC
# FAX COVER SHEET

**4717 15TH STREET, N.W., WASHINGTON, D.C. 20011**
**2120 L STREET, N.W. SUITE 210, WASHINGTON, D.C. 20039**
**202-822-3766    202-882-4745**
**FAX 703-995-4345    202-882-9895**

| Send to: _Jeff Dixon_ | From: _Lily Rosario_ |
|---|---|
| Attention: | Date: _9/20/02_ |
| Office location: | Office location: |
| Fax number: _212-665-5197_ | Phone number: |

☐ Urgent   ☐ Reply ASAP   ☐ Please comment   ☐ Please review   ☐ For your information

Total pages, including cover: _16_

Comments:

# WYZ GIRL ENTERTAINMENT CONSULTING, LLC

2120 L STREET, NW, SUITE 210
WASHINGTON D.C. 20037
202-822-3766

4717 15TH STREET, NW
WASHINGTON, D.C. 20011
202-882-4745 * HOME OFFICE

703-995-4345 (FAX)
info@wyzgirl.com

## MEMORANDUM

**TO:**     JEFF DIXON

**FROM:**   LITA ROSARIO, ESQ.

**RE:**     UNTOLD

**DATE:**   SEPTEMBER 20, 2002

Attached please find a fax of the final executed copy of the Untold Recording Agreement with Black Rain Records, Inc. dated March 28, 2002. I am still waiting for a better fax and a hard copy which Black Rain's former attorney is forwarding to me. Several pages of this fax a very difficult to read.

P0151

## TRANSACTION REPORT

FOR:

SEP-20-02 12:26 PM

SEND

| DATE | START | RECEIVER | PAGES | TIME | NOTE |
|------|-------|----------|-------|------|------|
| SEP-20 | 12:13 PM | 12126655197 | 17 | 12'45" | OK |

P0152

## EXCLUSIVE RECORDING AGREEMENT

AGREEMENT made this 2~th day of ~~February~~ *March* 2002 by and between Black Rain Records, Inc. (hereinafter called "Company") 1976 Flatbush Avenue, Brooklyn, New York 11234 and Antwann H. D. Frost residing at 1748 Flatbush Avenue, Brooklyn, New York 11210 and Darnell Ra'Shaun Smith residing at 1748 Flatbush Avenue, Brooklyn, New York 11210 and Kelvin Jaune Price residing at 1748 Flatbush Avenue, Brooklyn, New York 11210 and Craig Caper residing at 1748 Flatbush Avenue, Brooklyn, New York 11210 collectively professionally known as "Untold"(collectively and individually hereinafter referred to as "you").

## W I T N E S S E T H

In consideration of the mutual promises and covenants herein contained, the parties hereby agree as follows:

1. TERM

    (a)    The term hereof (the "Term") shall consist of an initial period (the "First Contract Period") plus the additional "Contract Periods", if any, by which such Term may be extended by Company's exercise of one or more of the options granted to Company below (unless otherwise extended or suspended as provided herein).

    (b)    You hereby irrevocably grant to Company five (5) separate consecutive options to extend the Term for a "Second", "Third", "Fourth", "Fifth", and "Sixth" Contract Periods, respectively. Each such option shall be exercised automatically and without notice unless Company shall give you written notice of termination of the Term not less than thirty (30) days prior to the date that the then current Contract Period would otherwise expire.

    (c)    The First Contract Period shall commence on the date hereof and shall continue until the date twelve (12) months after the delivery to Company of the Minimum Recording Commitment for the First Contract Period. Each subsequent Contract Period shall commence on the date following the date of expiration of the immediately preceding Contract Period and shall continue until the date twelve (12) months after the Delivery to Company of the Minimum Recording Commitment for such Contract Period. In the event that the Distribution Agreement (as hereinafter defined) provides for Contract Periods of longer duration, the provisions of the Distribution Agreement shall prevail.

    (d)    Notwithstanding anything to the contrary contained herein, you shall have the right to terminate the Term of this agreement by giving written notice to Company, if after twelve (12) months from the date of full execution of this agreement (the "Termination Date") Company has not entered into or substantially negotiated the material provisions of an agreement with a Major US Record Company (hereinafter the "Distributor") for the manufacture and distribution in the United States of records embodying Master Recording produced hereunder (the Distribution Agreement). A Major US Record Company shall be defined as Sony, BMG, EMI, WEA and Universal or any company distributed by the foregoing companies.

    (e)    If the Distribution Agreement expires or terminates prior to the date on which this agreement would expire if all options hereunder were exercised, then the current Contract Period and the Term of this

1

agreement shall automatically be deemed suspended until the date on which Company enters into a new Distribution Agreement (the "Second Distribution Agreement"). Notwithstanding the foregoing, said suspension shall not exceed six (6) months from the date Company notifies you of such suspension.

## 2.    RECORDING COMMITMENT

(a)    During each Contract Period, you shall render your exclusive services to Company as a recording artist for the purpose of making Master Recordings (and as otherwise set forth herein). You shall record one (1) Album during each Contract Period. The initial Album required during each Contract Period shall be referred to as the "Minimum Recording Commitment".

(b)    Notwithstanding anything to the contrary contained herein, in the event that the provisions of the Distribution Agreement provides for a Minimum Recording Commitment different from that set forth herein, as to number of Masters or Albums to be delivered, then the provisions of the Distribution Agreement as to the Minimum Recording Commitment shall control, and shall for all purposes be deemed incorporated herein.

## 3.    RECORDING PROCEDURE

(a)    In connection with Master Recordings to be made hereunder, the following matters shall be determined by Company and you, provided, however, in the event of a dispute Company's decision shall govern :

(i) Selection of the individual producers;

(ii) Selection of material to be recorded (including the number of Compositions to be recorded); and

(iii) Dates of recording and selection of studio where recording is to take place, including the cost of recording therein. The scheduling and booking of all studio time will be done by Company or the Distributor, and the Master Recordings shall be recorded under Company's (or Distributor's) recording license.

(b)    Each Master Recording made hereunder shall be subject to the Company and Distributor's approval as technically and commercially satisfactory for the manufacture and sale of Phonograph Records.

## 4.    RECORDING COSTS

(a)    Company (or the Distributor) will pay all specifically approved Recording Costs submitted in writing in connection with Master Recordings made hereunder. Notwithstanding the foregoing, you shall be solely responsible for paying any Recording Costs incurred by Company or the Distributor which are in excess of the recording budget approved by Company and the Distributor if not caused solely by Company or Distributor. You shall reimburse Company on demand for any such costs or, at Company's discretion, Company may deduct an amount equal to such excess costs from all monies payable to you hereunder. You shall not incur any Recording Costs without Company's prior written approval.

(b)    Nothing contained in this agreement shall obligate Company to permit the continuation of any recording session to be held in connection with Master Recordings hereunder, if either the Company or the Distributor determines that the Master Recordings being recorded will not be satisfactory in any respect, or

2

will exceed the recording budget approved by Company and/or the Distributor.

(c)      Upon your request, Company shall furnish you with a schedule of all Recording Costs incurred in connection with Master Recordings hereunder.

5.      **GRANT OF RIGHTS**

(a)      All Master Recordings recorded hereunder from the inception of recording thereof, and all Phonograph Records manufactured therefrom, together with the performances embodied thereon (excluding the underlying musical composition), shall be the sole property of Company (or, if Company so designates, the Distributor) throughout the world, free from any claims whatsoever by you or any other Person; and Company (or the Distributor) shall have the exclusive right to secure copyright protection of such Master Recordings in its name as the owner and author thereof and to secure any and all renewals and extensions of such copyright. Solely for the purposes of any applicable copyright law, the product of all Persons rendering services in connection with the recording of such Master Recordings, including you, are and shall be deemed to be "work made for hire" of Company (or the Distributor).

(b)      Without limiting the generality of the foregoing, Company and any Person authorized by Company shall have the unlimited right, throughout the world, to manufacture Phonograph Records by any method now or hereafter known, derived from the Master Recordings made hereunder, and to sell, market, transfer or otherwise deal in the same under any trademarks, trade names and labels, or to refrain from such manufacture, sale and dealing.

(c)      Company and any Person authorized by Company each shall have the right, to reproduce, print, publish, or disseminate in any medium your name, approved portraits, approved likenesses and approved biographical material concerning you, as news or information, or for the purposes of promotion and trade, and in connection with merchandising of any kind ("Merchandising Rights") including, without limitation the sale of clothing, toys, games, posters and all other tangible goods and for advertising purposes thereof; provided, however, that no endorsement (whether direct or indirect) by you of any product or service shall be used without your prior written consent. You shall have the right to approve the portraits, pictures, likenesses and biographical material pertaining to you. Such approval shall not be unreasonably withheld and shall be given to Company within three (3) days after such material is made available to Artist for approval. Your failure to give Company notice of approval or disapproval within such time period shall be deemed approval of the material. During the Term, you shall not authorize any Party other than Company to use your name or likeness in connection with the advertising or sale of Phonograph Records. As used in this agreement, the word "name" shall include any professional names or sobriquets used by Artist.

6.      **ROYALTIES AND ADVANCES**

(a)      Conditioned upon your full and faithful performance of all the material terms and conditions hereof, Company shall pay to you with respect to the exploitation of the Master Recordings hereunder FIFTY (50%) percent of "Net Record Royalties" (as defined herein). Notwithstanding the foregoing, Company shall pay to you a Net Record Royalty of no less than Eight (8%) percent .

(b)   (i)      Company shall pay Artist an advance equal to one-half (½) of the Advance Company actual receives from Distributor for each album recorded and released hereunder. Once Company enters into a Distribution Agreement, said advance shall be payable fifty (50%) percent following commencement of recording and the balance following delivery and acceptance of the album by Company/Distributor. Notwithstanding the foregoing, Company shall

3

have the right to reduce the advance by an amount not to exceed fifty (50%) percent of the legal fee paid by Company to secure the Distribution Agreement.

(ii)     Company shall use its good faith efforts to request that Distributor pay, out of your share of the Advance to the extent possible and pursuant to Paragraph 6(b)(i) above, the sum of Ten Thousand ($10,000) Dollars to your attorney (Lita Rosario, Esq. EIN#:          ).  The foregoing payment, if made, shall be made as an accommodation only and Lita Rosario shall not be deemed a third party beneficiary of this agreement.

(c)     Company shall pay to Artist with respect to the exploitation of Merchandising Rights, fifty (50%) percent of "Net Merchandising Royalties" (as defined herein) actually received during the First and Second Contract Periods; thirty-five (35%) percent of Net Merchandising Royalties actually received during the Third and Fourth Contract Periods; and twenty (20%) percent of Net Merchandising Royalties actually received during any other Contract Periods.

(d)     Company shall have the right to recoup any and all monies expended on your behalf or paid to you or on your behalf.

7.     CO-PUBLISHING AND EXCLUSIVE ADMINISTRATION RIGHTS

(a)     Grant of Rights

(i)     In consideration of the investment and commitments made by Company hereunder, Artist hereby irrevocably and absolutely assigns, conveys, transfers and sets over to Company an undivided fifty (50%) percent interest in all worldwide right, title, interest and ownership of every nature, kind and description in and to the "Musical Compositions" (as defined herein) recorded for Company's Artists and Producers only, including, without limitation, the worldwide copyrights therein, and any and all extensions of such copyrights.

(ii)     Promptly following Artist's recording of a Composition hereunder, Artist shall execute and deliver to Company a "Transfer of Copyright" document in the form attached hereto as Exhibit A; nevertheless, the recording shall constitute the assignment and transfer to Company of all rights described above.  In the event Artist shall fail or refuse to execute a Transfer of Copyright as provided above, Company shall have the authorization and is hereby empowered as Artist's attorney-in-fact to execute such Transfer of Copyright in Artist's place and with the same force and effect as if executed by Artist.  Such power is coupled with a pecuniary interest and is irrevocable.

(b)     Administration Rights

(i)     Artist hereby grants to Company the sole and exclusive right to act throughout the world as the exclusive administrator of all rights in and to the Musical Compositions; and such grant shall include but not be limited to the following rights:

(A)     The right to secure copyright registration and renewal copyright registration in the joint names of Company and Artist under any law now in effect or hereinafter enacted;

(B)     All rights of control, publication, printing, performance, mechanical or other reproduction, synchronization, sale, exploitation, arrangement, adaptation, translation, use and disposition, now

4                              P0156

publicity and promotion costs, printing costs, editing costs; and

(ii)    Any and all royalties that are payable to songwriter(s) of the Musical Compositions.

(d)    Publishing Royalties

(i)    Company shall pay to you an amount equal to seventy-five (75%) percent of the Gross Receipts remaining after deduction of: (A) any and all sums payable to co-publishers, provided said sums do not exceed twenty (20%) percent of Gross Income; income participants, and other third parties with respect to the Musical Compositions; and (B) the administration costs described in Paragraph 7(c) of this Agreement and any other reasonable out-of-pocket expenses incurred by Company in connection with the Musical Compositions. Upon Company's recoupment of Advances actually paid to you pursuant to this Agreement, Company shall pay you royalties in accordance with the terms of this Paragraph 7.

(ii)    In the event Company enters into a co-publishing agreement with a third party Publisher, Company shall pay to you an amount equal to fifty (50%) percent of the Net Advances actually receive by Company from said Publisher for the Musical Compositions subject to this Paragraph 7.

(iii)    Public performing rights societies shall be authorized and directed to: (A) pay the writer's share of performance fees in respect of the Musical Compositions to the songwriter(s) and such fees shall be excluded from Gross Receipts; and (B) pay the publisher's share of performance fees in respect of the Musical Composition to Company and such fees shall be included in Gross Receipts.

Notwithstanding anything to the contrary above, Company shall have matching rights in the event that the publishing reverts to Artist.

8.    ROYALTY ACCOUNTING

(a)    Company shall compute and pay all royalties due Artist hereunder on a semi-annual basis (June 30th and December 31st of each year) for all sums earned and payable hereunder. Such semi-annual payments and accountings showing the amount of Net Royalties paid hereunder shall be rendered to Artist by Company within ninety (90) days immediately following the end of each semi-annual period. Upon request, Company will provide Artist with a copy of Company's relevant royalty statement from its Distributor.

(b)    If Company is unable, for reasons beyond its control, to receive payment for foreign sales in United States Dollars in the United States of America, royalties therefor shall not be credited to Artist's account during the continuance of such inability. If any accounting rendered to Artist hereunder during the continuance of such inability requires the payment of royalties to Artist, Company will use reasonable efforts to deposit such royalties to Artist's credit in such foreign currency in a foreign depository at Artist's expense.

(c)    Artist shall have the right to audit Company's books and records with respect to a royalty statement within one (1) year after such statement has been rendered to Artist, upon reasonable written notice to Company. Such examination shall be conducted at Artist's sole cost and expense, by any certified public accountant or attorney designated by Artist not then engaged in an outstanding examination of Company's books and records on behalf of a Person other than Artist. Such examination shall be made during Company's usual business hours at the place in New York where Company maintains the books and records which relate to Artist and which are necessary to verify the accuracy of the statement or statements specified in Artist's notice to Company and Artist's examination shall be limited to the foregoing. Artist's right to inspect

6

SEP 26 2002 11:36AM   LEIBOWITZ ROBERTS & RITHO   212 213-4311   P.5

or hereafter known;

       (C)    The right to transpose, revise, add to, take from and substitute, and to prepare derivative works based on, the Musical Compositions;

       (D)    The right to use the name, photograph, likeness, and/or biographical material of any and all songwriters of the Musical Compositions for the purposes of trade or otherwise in connection with the Musical Compositions;

       (E)    All rights to sell, license, assign, and enter into agreements to or with any person or entity with respect to all or part of the rights contained in this Paragraph 7(b);

       (F)    The right to exercise any right Company deems necessary or desirable in connection with the administration, exploitation, or protection of the Musical Compositions; and,

       (G)    The right to set fees and royalties and to collect any and all monies accruing or earned from the Musical Compositions or the exercise of any of the rights contained in this paragraph 7(b).

       (i)    Artist shall promptly deliver to Company (1) typed lyric sheet of any of the Musical Compositions, (2) lead sheets of any of the Musical Compositions and (3) copies of photographs, likenesses and biographical material of the songwriters of Musical Compositions.

       (ii)    Any legal action brought by Company against any alleged infringer of any Musical Composition shall be initiated by Company only, in its sole and complete discretion, and shall be prosecuted at Company's sole expense, and with respect to any recovery had by Company as a result thereof, after deducting any and all expenses of litigation incurred by Company, including reasonable attorneys' fees, a sum equal to fifty (50%) percent thereof shall be paid by Company to Artist after recoupment of any outstanding Advances made to Artist provided for in this Agreement.

       (iii)    Artist hereby agrees to comply with and authorizes Company and its designated publishing representatives to comply with the applicable provisions of the Distribution Agreement in connection with the mechanical and other licensing of Musical Compositions. In the event the cost of mechanical licensing exceeds the amounts established in the Distribution Agreement, such excess shall be borne by Artist and Company equally.

       (iv)    The rights granted herein shall endure for a period co-extensive with the protection of any and all worldwide property rights in the Musical Compositions at common law or by statute, whether heretofore or hereafter enacted, including the worldwide copyrights therein and any and all extensions and renewals thereof.

    (c)    Administration Costs

       Company or Company's publishing designee shall deduct and retain from "Gross Receipts" (as defined herein), the following:

       (i)    All direct out-of-pocket expenses which Company or its designee(s) incurs with respect to the Musical Compositions, including, but not limited to, the reasonable costs of lead sheets, producing demonstration records, third party collection fees, accounting fees, copyright office fees, advertising,

Company's books and records shall be only as set forth in this Paragraph 8(c) and Company shall have no obligation to produce such books and records more than once with respect to each statement rendered to Artist.

(d)    Unless notice shall have been given to Company as provided in Paragraph 8(c) hereof, each royalty statement rendered to Artist shall be final, conclusive and binding on Artist and shall constitute an account stated. Artist shall be foreclosed from maintaining any action, claim or proceeding against Company in any forum or tribunal with respect to any statement or accounting rendered hereunder unless such action, claim or proceeding is commenced against Company in a court of competent jurisdiction within one (1) year after date such statement or accounting is due.

## 9. WARRANTIES, REPRESENTATIONS, RESTRICTIONS AND INDEMNITIES

(a)    You warrant and represent that:

(i)    You are not now nor will be under any disability, restriction or prohibition, whether contractual or otherwise, with respect to (A) your right to enter into this agreement, and (B) your right to grant the rights granted to Company hereunder, to perform each and every term and provision hereof, and to record each and every Composition and other musical composition recorded by you hereunder;

(ii)    Company shall not be required to make any payments of any nature for, or in connection with, the acquisition, exercise or exploitation of rights by Company pursuant to this agreement, except as specifically provided in this agreement;

(iii)    You are or will become and will remain to the extent necessary to enable the performance of this agreement, a member in good standing of all labor unions or guilds, membership in which may be lawfully required for the performance of your services hereunder;

(iv)    Neither the "Materials" nor any use of the Materials by Company or the Distributor will violate or infringe upon the rights of any Person.

(v)    All of your representations and warranties shall be true and correct upon execution hereof and shall remain in effect in perpetuity. Company's acceptance of Master Recordings or other Materials hereunder shall not constitute a waiver of any of your representations, warranties or agreements in respect thereof.

(vi)    You warrant and represent that you are a writer-member of ASCAP/affiliated with BMI, and that your publishing designee is or shall become a publisher-member of ASCAP/affiliated with BMI.

(b)    (i)    During the Term of this agreement, you will not enter into any agreement which would interfere with the full and prompt performance of your material obligations hereunder, and, subject to the terms and conditions contained herein, you will not perform or render any services for the purpose of writing or composing Musical Compositions or making Phonograph Records or Master Recordings for any person other than Company (except as sidemen or background vocalists, the terms of which shall be determined by the Distribution Agreement). After the expiration of the Term of this agreement, for any reason whatsoever, you will not perform any Musical Composition which shall have been recorded hereunder for any person other than Company for the purpose of making Phonograph Records or Master Recordings prior to the date five (5) years subsequent to the date of delivery of the Master containing such Composition or three (3) years subsequent to the expiration of the Term of this agreement, whichever is later. Notwithstanding the

foregoing sentence, in the event the Distribution Agreement contains a longer restrictive period than the period described in the preceding sentence, the restrictive period contained in the Distribution Agreement shall be applicable in lieu of the period contained in the foregoing sentence; and

(ii)     You will not at any time during the Term hereof record, manufacture, distribute or sell, or authorize or knowingly permit your performances to be recorded by any party for any purpose without an express written agreement prohibiting the use of such Recording on Phonograph Records in violation of the foregoing restrictions. You may perform as a so-called "sideman" with third parties, you shall be permitted to do so provided you comply with the provisions of the Distribution Agreement and obtain Company's prior written approval.

(c)     In the event that you shall become aware of any unauthorized recording, manufacture, distribution or sale by any third party in contravention of the foregoing re-recording restrictions, you shall notify Company thereof and shall cooperate with Company in the event that Company commences any action or proceeding against such third party.

(d)     You will at all times indemnify and hold harmless Company, any Licensee of Company and Distributor from and against any and all claims, damages, liabilities, costs and expenses, including legal expenses and reasonable counsel fees, arising out of any alleged breach or breach by you of any warranty, representation or agreement made by you herein. You will reimburse Company and/or its Licensees or Distributor on demand for any payment made at any time after the date hereof in respect of any liability or claim reduced to a final judgment or settled with your consent, not to be unreasonably withheld, in respect of which Company or its Licensees or Distributor are entitled to be indemnified. Upon the making or filing of any such claim, action or demand, Company shall be entitled to withhold from any amounts payable under this agreement such amounts as are reasonably related to the potential liability in issue. Company shall release all such amounts withheld in the event formal proceedings are not commenced within one (1) year from the date of the initial claim or settlement discussions have begun within said one (1) year period. In the event that you post a bond, acceptable in all respects to Company, in an amount reasonably related to the amount of the potential liability, Company may release any monies so withheld. You shall be notified of any such claim, action or demand and shall have the right, at your own expense, to participate in the defense thereof with counsel of your own choosing; provided, however, that Company's decision in connection with the defense of any such claim, action or demand shall be final.

(e)     You shall execute and deliver to Company, promptly upon Company's request therefor, a form of artist inducement and guarantee letter as may be required by a Distributor in a form acceptable to Distributor. If you fail to execute the documents mentioned above within three (3) days, you hereby grant Company the power of attorney to execute the documents on your behalf.

(f)     You shall comply with all of the terms and conditions of this agreement and the Distribution Agreement to enable Company to fulfill all of its obligations under the Distribution Agreement.

10.   **DEFINITIONS**

As used in this agreement, the following terms shall have the meanings set forth below:

(a)     "Master Recordings" or "Masters" - each and every Recording of sound, whether or not coupled with a visual image, by any method and on any substance or material, whether now or hereafter known, which is used or useful in the recording, production and/or manufacture of Phonograph Records.

(b)    "Person" and "Party" - any individual, corporation, partnership, association or other organized group of persons or legal successors or representatives of the foregoing.

(c)    "Net Record Royalties" - royalties received by Company from the Distributor or any other distributor excluding any royalty payments made to individual producers including but not limited to mixers, remixers and any other third parties in connection with recording the Masters hereunder.

(d)    "Records", "Phonograph Records" and "Recordings" - all forms of reproductions, now or hereafter known, manufactured or distributed primarily for home use, school use, juke box use, or use in means of transportation, embodying (i) sound alone, or (ii) sound coupled with visual images.

(e)    "Advance" - amount recoupable by Company from royalties to be paid to you or on your behalf pursuant to this agreement.

(f)    "Composition" - a single musical composition, irrespective of length, including all spoken words and bridging passages and including a medley;

(g)    "Recording Costs" - all payments to vocalists, musicians, arrangers, sketchers, conductors, orchestrators, producers, contractors and copyists in connection with the recording of the Master Recordings and demonstration tapes made hereunder, and all union scale payments required to be made to you in connection with your recording services hereunder, together with payroll taxes thereon, payments based on payroll to any labor organization or designee thereof, advances and/or fees to the producer of the Master Recordings, the cost of cartage and rental of instruments for such recording sessions, studio costs, sample clearance costs, transportation costs, hotel and living expenses incurred in connection with the preparation and attendance of performers, musicians and other essential personnel at recording sessions, tape, editing and other similar costs in connection with the production of the final tape master and the lacquer master, and all other costs generally and customarily recognized as recording costs in the recording industry.

(h)    "Album" - one (1) twelve-inch, 33-1/3 rpm long-playing Record, or the equivalent thereof. Albums recorded hereunder shall contain not less than forty (40) minutes of playing time. Multiple sets which consist of more than one Album intended to be released, packaged and sold together for a single, overall price shall be deemed to be the equivalent of one (1) Album for the purposes of this agreement, but shall not be recorded or delivered hereunder without Company's prior written consent.

(i)    "Single" or "Single Record" - a 7-inch or 12-inch Record embodying not more than two (2) selections on each side.

(j)    "Licensees" - includes, without limitation, any Distributor and all subsidiaries, wholly or partly owned, and other divisions of company and any of Company's licensees.

(k)    "Net Merchandising Royalties" - the royalties received by Company from any and all third parties with respect to the exploitation of Merchandising Rights, less all costs incurred by the third party distribution licensee in connection therewith, including without limitation, the manufacture, distribution, sale and transportation of merchandising materials.

(l)    "Delivered" or "Delivery" - the actual receipt by Company of fully mixed and edited Master Recordings commercially and technically satisfactory to Company and Distributor and ready for the

manufacture of Phonograph Records, and all necessary licenses, consents and approvals.

(m) "Distribution Agreement" - an agreement with a Record Company for the manufacture and distribution in the United States of records embodying Master Recordings produced hereunder.

(n) "Musical Compositions" shall be defined as all musical compositions written, composed or created, in whole or in part, prior to or during the Term by you or any "Affiliated Person" (as hereinafter defined) and recorded for Company's Artists and Producers. For the avoidance of doubt, "Musical Compositions" shall comprise the Musical Compositions only to the extent of your and/or any Affiliated Person's contribution or the contribution of any writer whose share of Musical Compositions is owned or controlled by you or any Affiliated Person.

(o) "Affiliated Person" shall be defined as any individual, corporation, partnership or association or other organized group of persons or successors or representatives of the foregoing that (i) is owned or controlled by you, (ii) that owns or controls you, or (iii) is under common ownership with you.

(p) "Gross Receipts" shall be defined as all monies (less all sums charged by third party collection agents, subpublishers and others, and foreign taxes, if any) actually earned and received by Company in the United States from the exploitation of the Musical Compositions throughout the Territory.

(q) "Materials" - any musical, artistic and literary materials, ideas and other intellectual properties, furnished by Artist and contained in or used in connection with any Recordings made hereunder or the packaging, sale, distribution, advertising, publicizing or other exploitation thereof.

(r) In the event of any inconsistency between the definitions or terms set forth in this agreement and the definitions and terms contained in the Distribution Agreement, the provisions of the Distribution Agreement shall control. Any terms defined in the Distribution Agreement which are not defined herein shall have the same meaning herein as in the Distribution Agreement.

11.    **SUSPENSION AND TERMINATION**

(a) If your voice or your ability to perform as an instrumentalist becomes materially impaired, or if you fail, refuse, neglect or are unable to comply with any of your material obligations hereunder (including, without limitation, failure to timely fulfill your recording commitment) then, in addition to any other rights or remedies which Company may have, Company shall have the right, exercisable at any time by notice to you: (i) to terminate this agreement without further obligation to you as to unrecorded Master Recordings, or (ii) to extend the then current Contract Period of the Term for the period of such default plus such additional time as is necessary so that Company shall have no less than sixty (60) days after completion of your recording commitment or the fulfillment of any other material obligation within which to exercise its option, if any, for the next following Contract Period. Company's obligations hereunder shall be suspended for the duration of any such default, but in no event for a period greater than thirty (30) days following any corresponding suspension by the Distributor;

(b) Company reserves the right, at its election, to suspend the operation of this agreement for the duration of any of the following contingencies, if by reason of any such contingency, it is materially hampered in the performance of its obligations under this agreement (or the Distributor is materially hampered in the performance of its obligations under the Distribution Agreement) or its or Distributor's normal business operations are delayed or become impossible or commercially impracticable: act of God, fire, catastrophe, labor disagreement, acts of government, its agencies or officers, any order, regulation, ruling or action of any labor

10

union or association of artists, musicians, composers or employees affecting Company, the Distributor or the industry in which it is engaged, delays in the delivery of materials and supplies, or any other cause beyond Company's control.

## 12. LEGAL AND EQUITABLE RELIEF

You acknowledge that your services hereunder, as well as the Master Recordings recorded and the rights and privileges granted to Company under the terms hereof, are of a special unique, unusual, extraordinary and intellectual character which gives them a peculiar value, and that, in the event of a breach by you of any material term, condition, representation, warranty or covenant contained herein, Company will be caused irreparable injury and damage. You expressly agree that Company shall be entitled to seek the remedies of injunction and other equitable relief to prevent or remedy a breach of this agreement, which relief shall be in addition to any other rights or remedies, for damages or otherwise, which Company may have.

## 13. ASSIGNMENT

Company may assign this agreement or any of its rights hereunder to Distributor or to any company or entity owned or controlled by Company. Company may also assign its rights hereunder to any of its Licensees to the extent necessary or advisable in Company's sole discretion to implement the license granted. You may not assign this agreement or any of your rights or obligations hereunder and any such purported assignment shall be void; provided, however, that you may assign this agreement to any corporation wholly owned by you through which you may furnish your services in the future, subject to your execution and delivery of an Inducement letter or such other documents as Company may reasonably require in a form reasonably acceptable to Company and Distributor.

## 14. NOTICES

Except as otherwise specifically provided herein, all notices hereunder shall be in writing and shall be given by registered or certified mail or telegraph (prepaid), at the respective addresses hereinabove set forth, or such other address or addresses as may be designated by either party. Such notices shall be deemed given when mailed or delivered to a telegraph office, except that notice of change of address shall be effective only from the date of its receipt. A copy of all notices sent to Company shall be sent to Law Offices of Johan S. Powell, 315 Park Avenue South, 19th floor, New York, New York 10010. A copy of all notices sent to you shall be sent to WYZ Girl Entertainment Consulting, LLC, 4717 15th Street, NW, Washington, DC 20011, provided that Company's failure to give said notice shall not be deemed a breach of this agreement.

## 15. FAILURE OF PERFORMANCE

The failure by Company to perform any of its obligations hereunder shall not be deemed a breach of this agreement unless you give Company written notice of such failure to perform and such failure is not corrected within thirty (30) days from and after Company's receipt of such notice, or, if such breach is not reasonably capable of being cured within such thirty (30) day period, Company does not commence to cure such breach within such thirty (30) day period and proceed with reasonable diligence to complete the curing of such breach thereafter.

## 16. DISTRIBUTION AGREEMENT

In the event that at any time during the Term Company shall enter into the Distribution Agreement,

P0163

then, notwithstanding anything to the contrary contained in this agreement:

(a) Company shall have the right, at Company's election, to extend any Contract Period(s) to be co-extensive with the then-current period of the Distribution Agreement.

(b) Company may conform any provision (e.g., reserves, free goods, etc.) of this agreement to the provisions of the Distribution Agreement, including, without limitation, the Term and the Minimum Recording Commitment.

17. **APPROVALS**

Wherever in this agreement your or Company's approval or consent is required, such approval or consent shall not be unreasonably withheld. Company may require you to give or withhold such approval or consent by giving you written notice requesting same and by furnishing you with the information or material in respect of which such approval or consent is sought. You shall give Company written notice of approval or disapproval within five business (5) days after such notice. You shall not hinder nor delay the scheduled release of any Record hereunder. In the event of disapproval or no consent, the reasons therefor shall be stated. Failure to give such notice to Company as aforesaid shall be deemed to be approval. Notwithstanding the foregoing, you shall at all times cooperate with Company to comply in a timely manner with the approval requirements set forth in the Distribution Agreement.

18. **INTENTIONALLY DELETED**

19. **MISCELLANEOUS**

(a) This agreement contains the entire understanding of the parties hereto relating to the subject matter hereof and cannot be changed or terminated except by an instrument signed by both parties. A waiver by either party of any term or condition of this agreement in any instance shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof. All remedies, rights, undertakings, obligations, and agreements contained in this agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either party. The headings of the paragraphs hereof are for convenience only and shall not be deemed to limit or in any way affect the scope, meaning or intent of this agreement or any portion thereof.

(b) It is understood and agreed that in entering into this agreement, and in rendering services pursuant thereto, you have, and shall have, the status of an independent contractor and nothing herein contained shall contemplate or constitute you as Company's employee, partner or agent.

(c) Those provisions of any applicable collective bargaining agreement between Company and any labor organization which are required, by the terms of such agreement, to be included in this agreement shall be deemed incorporated herein.

(d) This agreement has been entered into in the State of New York, and the validity, interpretation and legal effect of this agreement shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely within the State of New York with respect to the determination of any claim, dispute or disagreement which may arise out of the interpretation, performance or breach of this agreement shall be subject exclusively to the jurisdiction of the state courts of the State of New York or the Federal District Court for the Southern District of New York; and

P0164

(e)    If any part of this agreement shall be determined to be invalid or unenforceable by a court of competent jurisdiction or by any other legally constituted body having jurisdiction to make such determination, the remainder of this agreement shall remain in full force and effect.

(f)    Company shall use its reasonable good faith efforts to obtain provisions in the Distribution Agreement which concern Album Release commitments, so-called pay or play provision, video commitments, and tour support, provided, however, Company's failure to obtain theses provisions shall not be deemed a breach of this agreement.

IN WITNESS WHEREOF, the parties hereto have executed this agreement on or about the day and year first above written.

BLACK RAIN RECORDS, INC.

By: _____
        Authorized Signatory

AGREED AND ACCEPTED:

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
Antwann H. D. Frost
S.S.#:

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
Darnell Ra'Shaun Smith
S.S.#:

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
Kelvin Jaune Price
S.S.#:

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
Craig Capers
S.S.#:

13                    P0165

P.14

## TRANSFER OF COPYRIGHT

For good and valuable consideration, receipt whereof is hereby acknowledged, the undersigned hereby transfer to BLACK RAIN RECORDS, INC., PUBLISHER DESIGNEE, fifty (50%) percent of all the right title and interest in and to the copyright and fifty (50%) percent of the rights comprised in the copyright, without limitation, in the controlled musical compositions.

Antwann H. D. Frost

Darnell Ra'Shaun Smith

Kelvin Jaune Price

Craig Capers

P0166



## <u>RELEASE AGREEMENT</u>

This termination and release agreement (the "Release Agreement") is made and entered into as of this 24TH day of September, 2002 by and between Black Rain Records, Inc. (hereinafter collectively referred to as "Company"), and Antwann H. D. Frost, Darrell Ra'Shaun Smith, Kelvin Jaune Price and James O. Sievers  p/k/a "Untold" c/o WYZ Girl Entertainment Consulting, LLC, 2120 L Street, N.W., Suite 210, Washington, D.C. 20011  (hereinafter referred to collectively and individually as "Artist").

**WHEREAS,** Company and each of Artist collectively and individually have heretofore entered into an Exclusive Recording Agreement dated as of March 28, 2002 (herein the "Recording Agreement") pursuant to which Artist individually and collectively and as the recording group known as "Untold " were to render their exclusive recording services to Company; and

**WHEREAS,** Company and Artist desire to terminate said Recording Agreement and compromise and settle all matters among them, upon the terms and conditions hereinafter set forth;

**NOW, THEREFORE,** in consideration of the mutual promises and covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.    The Recording Agreement is hereby terminated with respect to the parties hereto, effective as of this 24th day of September 2002.  Neither Artist nor Company shall have any further obligation to the other pursuant to the Recording Agreement and any prior agreement between the parties.  Except as otherwise set forth herein, Artist and Company hereby release and forever discharge each other, their respective agents, employees, representatives, and successors-in-interest, from and all obligations arising under and all agreements, whether oral or written, including but not limited to the Recording Agreement, which may exist between the parties (or any affiliated person or entity of each of Artist or Company).

2.    (a)  Except as otherwise set forth herein, each of Artist,  their respective legal successors and assigns, representatives, partners, parents, subsidiaries, affiliates, members, officers, directors, agents, attorneys and employees (the "Artist's Releasors") do here by absolutely, fully and forever release, relieve, waive, relinquish and discharge Company, and Company's predecessors in interest, successors, assigns, officers, directors, agents, employees, representatives, partners, parents, subsidiaries, affiliates and each of them as applicable ("Company's Releasees") of and from any and all manner of action or actions, suits, debts, liabilities, demands, claims, obligations, costs, expenses, sums of money, controversies, damages, accounts, reckonings, and liens of every kind or nature whatsoever, whether known or unknown, suspected or unsuspected which each of Artist's Releasors, and each of them shall or may have, own or hold, or which they at any time heretofore had owned or held against the Company's Releasees by reason of , arising out of or in connection with any matter from the beginning time to the date hereof, based in whole or in  part or which may arise out of or may be related to the

Recording Agreement any prior agreement or this Release Agreement.

(b)  Except as otherwise set forth herein, Company, and Company's legal successors, and assigns, representatives, partners, parents, subsidiaries, affiliates, members, officers, directors, agents, attorneys and employees (the "Company's Releasors") do hereby absolutely, fully and forever release, relieve, waive, relinquish and discharge each of Artist, and their respective legal successors and assigns, representatives, partners, parents, subsidiaries, affiliates, members, officers, directors, agents, attorneys and employees (the "Artist's Releases") of and from any and all manner of action or actions, suits, debts, liabilities, demands, claims, obligations, costs, copyrights, expenses, sums of money, controversies, damages, accounts, reckonings, and liens of every kind or nature whatsoever, whether known or unknown, suspected or unsuspected which Company's Releasors, and each of then shall or may have, own or own , or which they at any time heretofore had owned or held against the Artist's Releasees by reason of , arising out of or in connection with any matter from the beginning time to the date hereof, based in whole or in part on or which may arise out of or may  be related to the Recording Agreement, this Release Agreement or any other matter.

3.      Artist agrees that in consideration of and for the mutual releases contained herein Company shall be entitled to receive: (i) the sum of $60,000 upon the execution hereof; (ii) one (1) royalty point from the first two (2) albums to be commercial released by Artist under the first distribution agreement with a Major US Record Company to be entered into by Artist; paid and accounted to Company on the same basis that Artist is paid and accounted pursuant to any such distribution agreement with a Major US Record Company; and (iii) Artist agrees that Company's name/logo shall appear on the first two (2) albums to be commercially released  by Artist pursuant to a distribution agreement with a Major US Record Company; provided, however, that Artist's failure to include such name or logo on such albums shall not be deemed a breach hereof and after receipt of a written notice from Company to Artist, Artist shall make reasonable efforts to include such name/logo on the next pressing of albums to be distributed pursuant to any such agreement.

4.      Company agrees to and does hereby absolutely, fully and forever indemnify, save and hold Artist (and Artist's Releasors) harmless of and from any and all claims, losses, damages, expenses (including reasonable attorney's fees and court costs), litigations, debts, money controversies, accounts, reckons, and liens of every kind or nature whatsoever, whether now known or unknown, suspected or unsuspected, which many come about because of any breach or claimed breach of any representation, warranty, covenant or agreement by Company contained in this Release Agreement and Company agrees to reimburse Artist respectively on demand for any such payment made or incurred by either Artist.

5.      The parties each represent and warrant that neither has assigned nor transferred any of the claims released herein, and that no person, firm, corporation, estate, insurance carrier, or other entity has surrogated to or has any interest or rights in any said claims.

6.      This Release Agreement contains the entire agreement between the parties hereto with respect to the matters set forth herein, and may not be altered amended, modified or otherwise changes in any respect whatsoever, except by written instrument

duly executed Company and each Artist. This Release Agreement has been entered into in the state of New York and the validity, interpretation and legal effect of the Release agreement shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely within the state of New York, with respect to the determination of any claim, dispute or disagreement which may arise out of the interpretation, performance or breach of the Release Agreement or the Recording Agreement.

7.    Artist acknowledges that it is within their contemplation that they may have claims against Company's Releasees and Company acknowledges this is within its contemplation that it may have claims against Artist's Releasees which, at the time of the execution of this Release Agreement, they have no knowledge or suspicion, but each represents acknowledges and agrees that the release provided here in shall extend to all claims in any way based upon, connected with or related to the matters described herein, whether or not known, claimed or suspected by Artist or Company.

8.    If any provision of this Release Agreement shall be held void, violable, invalid, or inoperative, no other provision of this Release Agreement shall be affected as a result thereof, and accordingly, the remaining provisions of this Release Agreement shall remain in full force and effect as though such void, voidable, in valid or inoperative provision had not been contained herein to the extent it is consistent with the intent and protections afforded by the entirety of this Release Agreement.

9.    The parties hereto acknowledge and agree that hey have been represented by legal counsel or have had adequate opportunity to consult with legal counsel in the negotiation of this Release Agreement, that the terms here of are fair and reasonable, and that they shall be bound hereby in all respects. This Release Agreement may be executed in counterparts; but shall not be effective against any party hereto until executed by such party. Unless otherwise separately defined herein, all terms used in this Release Agreement shall have the same meanings as are attributed to them in the Recording Agreement. Each of Artist and Company shall execute and further and other documents necessary or reasonably useful to effectuate this Release Agreement. This Release Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instruments.

Black Rain Records, Inc.
By:_____

_____
Linwood Roberts
An Authorized Signatory

_____
Antwann Frost individually
and as a member of "Untold"

_____
Kelvin Jaune Price individually
and as a member of "Untold"

_____
Darrell Ra'Shaun Smith individually
and as a member of "Untold"

_____
James O. Sievers individually and as a member of "Untold"

# WYZ GIRL ENTERTAINMENT CONSULTING, LLC
# FAX COVER SHEET

**4717 15TH STREET, N.W., WASHINGTON, D.C. 20011**
**2120 L STREET, N.W. SUITE 210, WASHINGTON, D.C. 20039**
**202-822-3766    202-882-4745**
**FAX 703-995-4345    202-882-9895**

| Send to: _Greg/Jeff_ | From: _Lita Rosario_ |
|---|---|
| Attention: | Date: |
| Office location: | Office location: |
| Fax number: _212-665-5197_ | Phone number: |

☐ Urgent  ☐ Reply ASAP  ☐ Please comment  ☐ Please review  ☐ For your information

Total pages, including cover: _4_

Comments:

_Unlock Release from Black Rain Records_

_Please have your attorney contact me. Lita Rosario_

P0173

## TRANSACTION REPORT

FOR:

SEP-26-02 02:26 PM

SEND

| DATE | START | RECEIVER | PAGES | TIME | NOTE |
|------|-------|----------|-------|------|------|
| SEP-26 | 02:23 PM | 12126655197 | 4 | 3'08" | OK |

P0174

UNITED STATES POSTAGE
P8966073U
FEB 12 03
MAILED FROM ZIP CODE 10165
$04.420

196
17105
2065

7099 3220 0003 4391 8235

WOODS & MIDDLETON, L.L.P.
ATTORNEYS AT LAW
LINCOLN BUILDING
60 EAST 42ND STREET, SUITE 1835
NEW YORK, NEW YORK 10165

Lita Rosario ESQ.
WU2 Girl Entertainment Consulting, LLC
1200 G Street Suite 370
Washington, DC 20005

20005+3814  1a